Let me say before you start, just for both counsel, I recognize that you wanted to continue the argument. We appreciate your being here. Just for logistical reasons, it was not feasible for us to postpone it, and that's why we've required you, I guess, to proceed today. But anyway, I just want to let you know that. Thank you. I appreciate it. May it please the Court, my name is David German. I represent the student appellant in this matter. I'd like to discuss three core issues with the Court today. The first is the ALJ's improper addition of a new requirement to the Rachel H. analysis. Second, I'd like to talk a bit about the centrality of goal progress as the core measure of a student's substantive educational progress under Andrew F. And third, I'd like to talk about the fact that the determination about the least restrictive environment within which a student can be educated involves the substantive component of what constitutes a free and appropriate education. And so that can't be overridden by methodological considerations. It's prior to that consideration. Can I ask you some background factual questions before we get to those? And I'm trying to make sure that I have the record right. In third grade, D.R. had a 75-25 split, correct? Yes, Your Honor. Fourth grade, the district proposed a new plan that your clients did not agree to. And the district left him in the previous split, correct? Yes. During third grade was the 17-18 school year. Yeah, that's why I'm using grades, because the years blur in my mind. Okay. Okay. And then for all the fourth grade, he was in the 75-25 split. Yes, Your Honor. They proposed a different plan for fifth grade, correct? I believe so. Your clients didn't agree to it. But it looks to me like the district didn't do anything to force. It doesn't affect your standing. You can attack the plan. But I'm just trying to figure out what happened here. Did the district say, were there any discussions about him just remaining in the current plan? Well, the district initially, in the mid-third grade year, in February of 2018, made its initial proposal. Right, I'm talking about the fifth grade plan right now. Right. Okay. They made a proposal. The other side didn't like it. It looks to me like the year before, even though they didn't like it, you said we're not going to force our proposal on you. I represent the state. Yeah, the district said we're not going to force our proposal on you. When you got to fifth grade, you didn't like it again. I'm trying to figure out whether or not the district had any intention of forcing that proposal on you for fifth grade. You're entitled to attack it. I'm just trying to figure out what happened here. It wasn't our – I don't think that was determinative. I don't think we believed that they were going to – And, therefore, you could bring the suit. If you'd brought the suit, when you brought the suit or the due process thing, DR was entitled to stay put in the current plan, correct? Yes. Now this leads to my – this is all background. Now this leads to the issue that's important to me, at least on your reimbursement claim. Rather than take that route, DR's parents pulled him out of the school and arranged for a private tutor. Rather than remain in the state placement. Rather than remain in the current placement. Right. Okay. As this case comes to us, your only challenge to the placement is that it includes too much non-mainstream time, non-classroom time, correct? Yes, Your Honor. That's the only thing that your brief raises. So for my analysis of the case, when I get to the fourth – any claim about fourth grade, your client received a FAPE. Because he was in a 75-25 split and you raised no other objections to the way the district was doing business. Well, you know, initially in the case that we did, in fact, claim that there – Right. And you litigated that in front of the ALJ. You lost. But as you come to us, all you're saying is it's the split that's the problem. It's true, Your Honor, but I believe that the application, this incredibly lawless application of Rachel H. No, I'm just trying to figure out what's properly in front of us. You may be exactly right that the ALJ erred and that the district court erred. I'm just trying to figure out what's appropriately in front of us. And since your client in fourth grade was in a 75-25 split and the only thing that your claim was wrong with the way the district treated him, as you come to us, is that they now want to depart from the 75-25 split. We don't have to worry about your fourth grade claim, do we? I don't quite understand how. How did your client not receive a FAPE in the fourth grade? Because they failed to provide appropriate inclusion support. No, but you didn't argue that to us. See, in your brief to us, all that you say is that the problem with the district is that they wanted to depart from the 75. And you never litigated the fourth grade issue until this due process hearing. So as it comes to us, I can't see that there's any issue in front of us about fourth grade. Except for the core issue of the overly restrictive proposed. But he was in exactly the environment in fourth grade that you're now contending is required by. But they still have to defend the IEPs in February. Well, they did defend the IEPs. They won. And in coming to us, you didn't challenge any aspect of the judgment below, except the 75-25 split. And perhaps that was an error. Whether it was an error or not. Rachel H. Whether it was an error or not, I just don't see that the fourth grade FAPE is in front of us. Anyway, you've given me the factual background. I'll figure out how it affects the law. I didn't want to take you off track later on. No, it's fine. I believe Rachel H. is such a core case for students like my client. For all students with substantial disability-related learning challenges who are in public schools. And the rulings below have been so shocking and, by my light, so lawless that I decided that we had to concentrate on the core Rachel H. issue. And dropped the ancillary claims. Can I ask you to pause for one second? Deanna, did we lose? Oh, no. There you are. Okay. Sorry. Just want to make sure you're still there. Go ahead. Okay. So the first point I wanted to touch on was this addition of a requirement that a student prove that it was actually the time in general education, apart from the overall educational program, including supplemental supports and services, that a student had to actually prove that that alone provided the educational benefit. And I just don't see that there's any requirement in the law. It seems directly contrary. Did the ALJ oppose that as a requirement? Or did you just make a finding on that point? Well, what he did was he said it was undisputed that the student had made academic progress during both the 17-18 and 18-19 school years and then made a finding that the student had not shown that he could make any educational progress within a general education program. So the only way I can understand that after puzzling over it endlessly, there's two possible readings. One is this kind of the straw man that he created saying, well, you want full inclusion. You don't just want a stay-put program. You want full inclusion. And so because you haven't proven that you could do it without the 25% of special education, that was never before the ALJ or the district court. So it could be that. But what appears equally likely is that he was saying, especially because he repeated it several times, was that we hadn't proven that the progress was directly attributable to being in the general education setting. And that absolutely flips the presumption of where a student with a disability should be educated. Let me push back on you a little on this and see how you answer it. I'm not sure the district did this here, but let's assume we had a district that came in with strong evidence that the student wouldn't continue to progress or might even regress if left in the current situation. And you had evidence that the student had progressed in the current situation in past years. Wouldn't a judge then be interested in trying to figure out, given the district's proof, what the progress came from? I'm sorry. Well, let me simplify it for you. What if the district had proved, and the ALJ found as a matter of fact, that there would be no further progress for DR if he were left in the current placement? They brought in teachers and experts and everything else. They didn't do that here, so it's hypothetical. Would it then be error to reduce the percentage of mainstream time? Without any analysis of whether the student would benefit from their proposed program? Yes. I think in this case— Well, what if the—again, maybe I'm giving you an incomplete hypothetical. I'm trying to figure out where the line is here. Your evidence in this case is that he was progressing under the current plan, and therefore he shouldn't be taken out of it. And that might be a winning argument. But I'm trying to figure out, as we deal with the case, how much would a district have to show to change the plan? And so I posited to you their proof was that there would be no further academic progress under the current placement. Is that enough to change the plan? Well, I'd like to make two points in response to that. Well, I'll wake up. The first is that the court's precedents and the way these cases are applied simply— they give a pass to districts, right? So the January 2022 Crofts v. Issaquah School District opinion in this court said, well, sure, the student was far behind grade level, and the student was not meeting all her goals, but she was making some progress on her goals, and so that's good enough. That counts as fair. And in this case, the student made undisputed progress on all his goals, and the bar is somehow artificially raised. The second issue is that I think it's really important. I think when this law was created, this idea of continuum was important because you wanted options for students if they could possibly be educated closer to a regular classroom, because everybody with this level of disability when the law was put in place was in a segregated special education center. Those barely exist anywhere now, and so the presumption is that kids will be educated, at least on a comprehensive campus with general education peers on that campus. The presumption is no longer that you're pushing from the direction of more restrictive into less restrictive. And so in a case like this, I think to really value the presumption that there will not be unnecessary segregation, even if a district proved, like your hypothetical says, even if a district was able to prove that no further progress could be expected within that setting, they would still have to take the second step. So I think the first, I think two things. I think that the academic prong of the Rachel H. analysis has become horribly over-weighted through kind of dicta that just keeps getting quoted and quoted and quoted. So as in this case, it's kind of the only consideration that courts look at. And I think that the first, the academic analysis should always require two steps. If a district can prove that there will not be further progress, then the burden should shift to the district to show that there is something a student will learn in the other setting that they can't learn where they are. They should have at least some minimum level of evidence that their proposed program will somehow benefit the child, because right now the default, and that's what the court did here, is to presume that segregation is the default. If you can't prove it, if you can't prove that you're going to make progress in general education, then we move you into segregation. Well, you brought this due process case. I did. So you had the initial burden of showing you weren't getting a FAPE, right? Or they weren't proposing a FAPE. That their IEP did not enforce. The IEP didn't propose it. Because, as I indicated in my previous questions, we're only fighting about the division now. And your view is that you carry that burden by showing that DR was making progress under the existing plan. According to their own people. Each preventative burden should have shifted to the district to disprove your… That there was some reason he should be removed, like in your hypothetical. If they then put on evidence, they just had a bunch of people say, well, we think it would be better. We put on evidence directly addressing all of those claims. Whether a student would get more individual attention. Whether there would be more instruction. Whether the instructional program proposed in that setting, the unique curriculum, was in fact more appropriate for him. We addressed each of those. And the court just ignored it. And, you know, I think just, you know, I just have half a minute. But to go back to what this test is about. I think that we need to put a little bit of burden on the district. Rather than just keeping everything on the student. To just, you know, if you can't show it, then you're out. Then you're segregated. I think we need to shift the burden. If a student can't show they're making progress. Or the district can show that the program they're currently in is inappropriate. Then the district should have to show something. They should have to show that their proposal, in some way, provides some prospect of benefit for the student. The second and third prongs of this analysis have almost completely fallen out. And I think it's essential that they become more robust. That they are brought back as central aspects of this balancing test. Because the second prong, the non-academic prong. What it means is the benefits of not being presumptively segregated from the rest of society. And the third prong benefits to the other students or difficulties is the benefit of living in a society. Where people who are different are not presumptively segregated. Those are massive things. Those are core things in our educational jurisprudence of this country. And to just wave them away, as they have in this case. And just say, well, he's not making enough progress. We're going to segregate him. That's horrifying. And I also think the fourth prong of this test. A quarter century ago, it may have made sense. But nobody argues it anymore. The districts think it's inappropriate to argue. So I think this is a case where we can make the district's obligations about what they have to show prior to segregating a student under Rachel H. Much more robust. And I would ask the court to do that. One question before you sit down. And we'll certainly give you time for rebuttal. You said that the second of the three points you wanted to cover. I think focused on how we're going to measure whether a student's making progress. And I think you were saying that it should be, I don't know, exclusively focused on whether the student is meeting the IEP goals. Or what did you? No, just that I think Andrew is clear that for a student who is not, in fact, at grade level. Whose disability related challenges are such that they're not going to make a year's progress in a year. And that they are below their same age peers. Andrew is very clear that the way you measure progress for those students is based on their individualized goals. And so in a case where a student has met or made progress on all goals. To just say, well, yeah, but we don't think that's important. I mean a student really has no, there's nothing else to fall back on, right? So your answer to Judge Watford is we measure it against the IEP. I believe that Andrew is clear that you have to focus on goal progress as the measure. For a student who's not, I mean, you could say, are they reading at a fourth grade level? But that doesn't make sense for students with more significant disability related learning challenges. Yeah, I guess what I'm trying to figure out is how much weight are you asking us to put on the fact that, I'm trying to remember the numbers, so you met four of the six goals. And made progress on the other two or something to that effect. Like if the mix had been, you know, we could just keep drawing the line further back. I'm just trying to get a sense of like, okay, at what point would the school district be justified in saying, listen, this just isn't working. Well, yeah, I think there's two points. I think that if you look at the cases where the district is arguing, hey, they made some progress. There's a lot of latitude, right? You can meet one or two goals out of five or six. You just have to make some progress. And so I think to treat students fairly, it doesn't have to be that high a standard. You have to be showing you're making some progress. But I would submit that that's where the burden shifting comes in. So if a district says, well, look, you only met one of five goals. We need to move you to a more segregated placement. I think that the district should then have to say, okay, we've shown that sufficiently. But here's what we're going to do that's going to be better for you. And I think that they should have some, you know, reasoned belief, rather than just kind of willful ignorance about what research shows behind them. I don't know. Just trying to be more charitable maybe to the district's witnesses here. I mean, I don't know. I don't know if you think they were sort of had your client's interests not at heart. But I think they were genuinely of the view that, no, we do think this other placement will be better and that he'll make more progress given what we've seen of his participation or lack thereof in the regular classroom. Better gets thrown back in parents' face under the IDEA every day. I guess what Judge Watford's resisting, and I'm resisting it too, is the argument that the district was lawless and it didn't have your client's interests at heart. It may have not complied with the act. But as he said, they brought in teachers who said, gee, he's on an island in my classroom. He's not getting great benefit out of being in my classroom at this point. That may not be sufficient. So my earlier question, Judge Watford's question this time, is you're asking us to make a ruling. What's our measuring stick? In your case, it may be easy. You're making progress on everything. But what's our measuring stick? Again, I think, well, I think as a foundational point, I think the burden should shift at some point. And, you know, I think that the evidence is well established. In the amicus briefs, they pointed to statewide studies. There's California Department of Education, you know, massive conferences trying to get people to understand that this model, that California's really, really far behind, and that just because we have these classrooms, just because we have this infrastructure set up that was set up 20, 30 years ago, does not mean that we have to maintain it. There are all kinds of questions about professional autonomy of people who teach in these classrooms. When you're asking them to push into general education classrooms and support students, there's all kinds of forces against it. But I think that it's important that districts finally be asked to somehow provide some evidence that a more segregated placement is going to benefit the student in question. See, if that's the, if the test is whether the district provided some evidence, they did in this case. I think you're better, you're arguing that as long as we're making progress on all the goals, you can't move us to a more segregated place. But that's your case. I'm just saying if the test is some evidence, and that, I think the district provided some evidence. It may not have been enough to overcome the presumption. It may not have been enough to demonstrate that the new plan was a fape. But I don't view this as a case in which the district acted arbitrarily or with ill motives. They proposed a plan, and that's why I asked the first question. They proposed a plan, and you took, your client took the student out of school. But all the evidence in this case previously, and this goes to the reimbursement claim, is that every time the parents objected, the district said, okay, you object, we'll leave him the way he is. And I can't figure out what happened with respect to the last plan. At the end, they believed, okay, for the second year in a row we've done this, for the second year in a row, the second year he made even more progress, right? No, I understand. The district says we have a plan, and your client said we don't like it. And I don't know why it just didn't proceed to the next step was, okay, as the district said twice before, if you don't like our plan, well, once before, if you like our plan, we'll leave him in the current situation. You know, it's not part of this case, but, yeah, obviously under this course precedent. Well, it is part of this case if you're seeking reimbursement for putting him in a different setting after that.  This course precedent in IR did, in fact, require the district to file. They did not, in fact, file at any point to defend their program. No, I understand that. But what happened, to talk about your exact question, what happened is they thought, okay, this is the third time that we're coming to an IEP. We've met all the goals or made progress on others. We have our independent educational therapist who's been supporting him outside of school coming here to show the second administration of an academic performance test, the KTEA. Those two are in the record, and her testimony about that is really impressive. I mean, he made tons of progress, so they present that. And they thought, hey, we want you guys to fulfill your obligation to provide us with a complete IEP prior to the start of the school year because they actually believed that the district would look at the evidence and say, yes, this is a student with significant disability-related needs, but he's doing great. He really is making progress, and we're going to leave him in here in a place where he made all kinds of friends. I mean, he is— You've gone, I think— I apologize. Answering my question. I'm sorry for taking you over time. Thank you. Thank you. We'll give you a little time for rebuttal. All right, so we're ready to hear from the lawyer for the district whenever you're ready. Good morning, Your Honors. May it please the Court, my name is Kristen Myers, and I represent the Redondo Beach Unified School District in this matter. I would like to start by addressing a couple of the points in Your Honor's questions. Before you do, if you're going to appear on Zoom with something behind you, I can't read it, so I'd love to know what it says. It says, life is either a grand adventure or nothing at all. Okay. I just want to make sure it wasn't anything insulting about the Ninth Circuit. No, it's definitely not. I'm happy to take it off the wall if you would prefer. No, that's fine. Please proceed. Okay. With respect to Your Honor's question about the placement and why the student was withdrawn for the fifth grade year, just to clarify, had he returned and the district decided not to file for due process, which was not an issue for hearing, he could have remained in the 75-25 split. As a matter of, if you didn't file a due process hearing to change his placement, as I read the act, he would have remained in his current placement. That's correct. And if they filed a due process hearing to challenge the proposed IEP, he would have remained in his current placement under the stay put provision. Yes, Your Honor. Okay. Thank you. That's what I was trying to get to. And I know you didn't start a due process hearing because that would have been a matter of record. Is there anything in the record about whether or not your client said to DR's parents, look, if you don't like this, we'll continue on the current path? Yes, that had been communicated to them multiple times. In fact, with each IEP... Is that in the record? It's in our briefing that if parents don't consent, if parents don't consent to any change in an educational program, the district cannot implement it over their... I understand that. I was asking a different question. My question is, did they beat you to the due process hearing? In other words, is there anything in the record that suggests that you were, you know, that you were going to proceed to force this plan on them? There's nothing in the record that says that the district was going to. They could have made that decision. Yeah, I don't want to go outside the record. Yeah. Thank you. So the other piece is Mr. Derman talked about burden shifting, and that is not the state of the law. There is no requirement that there's burden shifting at this point. And the sole issue on appeal to this court was whether the ALJ and the district court properly affirmed and decided consistent with Rachel H. And our position is that both the ALJ and the district court got the Rachel H. analysis correct. Well, let me ask you to address this then. They come in, put aside all their other evidence for a second. They come in. It's uncontested that DR is making progress on what he's achieved. As I counted, four of his six IEP goals, and he's making progress on the other two. And so they say the current plan, I know they're attacking other things at the edges, but they went away by the time they get to us. Under his current treatment, he's receiving a FAPE. And we want to continue that treatment. Isn't that enough to meet their burden of proof and require you to come back in and show that some more segregated is the wrong word, some more restrictive plan is better? So by filing for due process, as you noted earlier, they have the burden to establish that the district court is doing it. Right, and I'm positing that why doesn't the evidence that's uncontested, not the evidence that they present or the experts, but the uncontested evidence that you've got six IEP goals he's achieved, four he's making substantial progress on, two, why doesn't that at least meet their burden of production? They've now put in a case that you've got to rebut. Isn't that correct? Well, the district did at hearing. And the district's position and what the record shows is that the progress that student was making towards his goals was directly related to the support and one-on-one instruction he was receiving from the special education teacher both in the learning resource center and working one-on-one with his aide in the general education classroom. The concern for the district and why they believed more time in the special education setting was necessary was because the record and the testimony from the teacher showed that the progress he was making academically was not based on his time spent in the general education classroom. For example, he was in the general education classroom for part of his day. In that time, when they were working on academic tasks, he was working with a one-on-one aide on materials that were different and separate and apart from what the general education teacher was teaching the rest of the general education class. So this was not a district saying just because you're below grade level, you don't have a right to be in the general education class. That was not the point at all. They worked tirelessly to ensure that he had time in the mainstream in general education to work with his peers. But his academic functioning did not provide him a way to make meaningful progress from the general education curriculum. Sorry to interject, but I think under the statute, as I understand it, the inquiry ultimately is whether the student is making, I think the way the statute puts it, is whether education can be achieved satisfactorily in the current setting. What I hear your opponent saying that seems persuasive to me is we don't really have any other way of measuring whether education is being achieved satisfactorily other than looking at the objective IEP goals and whether the student is either meeting or making progress toward them, regardless of the source of the benefit. That's the yardstick we're supposed to use to measure whether, as the statute puts it, education is being made satisfactorily, it can be achieved satisfactorily. And here it seems like the answer is yes, it can be, and we have the proof of it in the form of the objective evidence that he's meeting these goals. So it doesn't seem to me it matters at that point whether you come in and say, well, he's meeting the goals only because of this or that or the other. Who cares? The statute puts a really heavy thumb on keeping him in the regular classroom as long as education can be achieved satisfactorily, and here it was. So help me understand why you think, nonetheless, moving him to a more restrictive placement was justified. Sure. So the IEP goals, for example, the academic IEP goals, those are not worked on, and by worked on meaning the general education teacher in the class, the general education class that they are saying that he should have more time in, is not working with the student, in this case, on those goals. Those goals are required to be worked on by the special education teacher. So the academic benefit was not derived from the general education teacher providing instruction to the student. But if we look at the program as a whole, the program that he's in as a whole, which involves special education instruction, some of it outside the mainstream classroom, some of it individualized instruction in the mainstream classroom, seems to be producing progress. Seems to be. Everybody agrees. It's produced achievement of four goals and progress towards the other two. So why is it that we need to change that program to a different one? Is it because he would achieve greater progress? Is it because he would stop achieving progress? I don't see anything in this record that lets me make those conclusions. Sure. So what the IEP team, and they're the individuals who have the greatest knowledge, the most experience working with the student. At the time that these offers were made, and we're talking about wanting to remove increases time in special education, going from the learning center to a special day class. So just to go back, the placement that appellant is now claiming they were willing to continue was the 75 percent of time in gen ed with 25 percent in the learning center. The district believed, based on the goal progress and the testimony from the teachers, is that this student required more direct, individualized time, and that's why they were recommending. No, I understand that. What I'm asking is, we went through a hearing, and so you may think he would benefit from more individualized time. You may think any number of things. But my question is, what did you show in this hearing? Did you show that he wouldn't continue to progress under the current placement? Did you show that he would continue to progress but more slowly? Did you show that he would regress under the current placement? It seems to me we have to measure, once we have somebody who's making progress towards the goals, and as Judge Watford said, they seem to be our measuring stick, what do you have to show to show that we ought to move them into a different placement? So what the ALJ and I think the district court affirmed was the testimony and evidence from the teacher, specifically working with him, that the general education curriculum in the class, for the period of time that he was in general education, they were unable to modify that work into a fashion that this student could meaningfully access and participate in. I assume that's true. But nonetheless, by only spending 25% of his time in the more restrictive setting, this student was making progress. So the question for me, given the act's presumption, is, why shouldn't I conclude that that 25% was sufficient to have him keep making this progress? And, you know, hypothetically, we don't know what progress he would have continued to make, but the expert and the educational specialist in the school setting did testify that they were concerned that he needed more direct instruction, more instruction targeted at his goals, where he could be in a setting where he could access the curriculum, albeit modify, with similarly situated students to make meaningful academic progress, which is the standard that the district is held to. And then at the same time, he would continue to participate in gen ed to receive the non-academic benefits. There was no dispute in this case that he was a well-liked student, that he liked seeing his other peers. But the testimony that was also elicited at hearing was that he spent very little time actually interacting in a meaningful way. He didn't have... And let me interrupt you, because I'm struggling with the issue Judge Watford and I have tried to articulate, and I know I haven't done it very well. The ALJ doesn't really make a finding that he wouldn't make progress if left in the current situation, or he'd regress, or his progress would be minimal. There may be evidence in the record to support those conclusions, but given the act's sort of presumption of maximum mainstream time possible, what kind of finding do we need from an ALJ to depart from that? So the finding that the ALJ... If I understand, and please let me know if I'm not answering your question. The ALJ's finding was that what the district offered was a free and appropriate public education for the student in the least restrictive environment in light of his individual circumstances. Sure, but I'm looking for the underlying factual findings. Obviously, that's his legal conclusion based on the facts. I'm looking for the underlying factual finding that might allow me to say yes, and that overcomes the act's presumption that you remain as much as possible in the mainstream setting. Sure, so again, the ALJ focused primarily on the testimony from the teachers regarding the student's performance and the ability of the student to access both the modified work and his inability to access the general education curriculum, even heavily modified. One of the IEPs and teachers testified as an example that in a general education classroom, where he was for part of his day, they would cover a topic in one to two days, whereas this student generally required one to two months to master a lesson or topic and only had approximately an attention span, basically two minutes and 40 seconds, to participate and maintain his attention during group instruction. That is not tenable to maintain in a general education class, which is why the district said we believe you're making progress with respect to your IEP goals as a result of the direct instruction you're receiving from a credentialed special education teacher, and we believe that meaningful progress, in order to continue, requires additional time in the special day class for part of your day. Okay, so now you're getting close to what I was trying to get to. So is it your view that if you show that meaningful progress towards the academic goals, because that seems to be what this is focused on, would not continue under the current plan, is that enough to reduce the amount of classroom time? Yes, I believe it does. The district's obligation is ongoing, which is why they have to change, potentially, as students' needs change. And the team absolutely believed that he required additional time in order to continue making progress. The record does show a history of the district working with the family. They knew their request was for continued mainstreaming, more inclusion. And so they worked really hard to work with the family to ensure that the student was getting more mainstreaming time. But as time went on, they were concerned that it was not enough time to meet this student's individualized needs, which is consistent with Rachel H. and the first factor. And there are a few Ninth Circuit cases where the court has specifically held, in Vacarizo versus Garden Grove, and in RM versus Gilbert Unified School District, and I can provide the citations, they're in our brief, that Ninth Circuit held, even when other factors weigh in favor of mainstreaming, the student's academic needs weigh most heavily against a mainstream environment. Yeah, and I would understand your argument, I'd be more sympathetic to it, frankly, if, let's say that DR had not met any of the goals and was continuing to sort of fall further and further behind. In that scenario, I think the district is justified to say, listen, we've tried this. It is not working. It's not working for the student. And that's why we think that greater benefits could be achieved in this other setting. But here we have the exact opposite, it seems to me. And so, yes, you have teachers saying, well, we think it's harder once you get to fifth grade. Things get harder. Things move faster. We don't think he's going to be able to continue the progress he's made. But the only objective evidence we have in front of us is that the current 75-25 split was working. It was allowing him to make satisfactory progress toward the goals. I just don't see how, in the face of that evidence, without anything, I could see if maybe like the following year, you know, he only met two, and then the year after that he only met one. You know, there was a trend line that was going in the wrong direction. I understand at that point the district being justified in intervening, but not in the face of this. This is continuous progress in the right direction under the current setting. So, again, I hear what you're saying. It was progress. And the testimony and evidence elicited at hearing was that they didn't believe that would continue. And one of the things that ALJ noted was that the academic demands and curriculum would only get increasingly more difficult. The gap between this particular student and the general education students would continue to grow. And noted specifically that in fifth grade, that gap would get wider. The academic demands in a fifth grade class would be significantly different. And that was one of the reasons. That was the precise reason. The district believed he required this additional intensive instruction to continue to make meaningful progress. And just to clarify, the district's offer at the end, May 2019, was still that the student would spend approximately 2.8 hours in the general education setting, and 3.48 hours in the special day class. This was not a significant... Well, how many hours was he in the other settings before? It was approximately 75 minutes. So you went from 75, 25 to essentially, and my math is never great, to 44, 56? Is that... Approximate. That's a pretty significant change. I mean, when you count hours, we're only dealing with a limited number of hours in the week. But if you look at percentages, it's a significant change. I know I'm over. If I could just add. Before they got to the 2.8 versus 3.48 split between gen ed and special ed, they began meeting again in February of 2018. And the district proposed four and a half hours in gen ed. And then in May 2018, they continued to be concerned that this amount of time in gen ed versus special ed was not appropriate to meet his needs. They didn't just automatically jump to increase the time or pull him out and segregate him just because he was working below grade level. The testimony from the teachers was specifically that he doesn't have the skills to access the general education curriculum, even with modifications, even with significant modifications. That could not be achieved satisfactorily in the general education environment. And that was the basis for the additional specialized academic instruction. They were concerned that that progress would be stalled or would not be meaningful if it continues. Okay. All right. Let me see if my colleagues have any other questions. No. No. Okay. Thank you very much for your argument. Let's put two minutes on the clock for rebuttal, please. So just briefly, I think we have to look in the record at what the expertise that she's talking about, the of the teachers and the school personnel shows us. In February of 2018, they sincerely believed he required additional segregation to make more progress. In May of 2018. Yeah, I wish you wouldn't use segregation. It has it has such negative connotations and you're not going to put him in a classroom with other students. More restrictive. You know, just more. It was it was increased non mainstream time. You know, I understand that you're uncomfortable with it. I understand it's a great argument to make to juries, but it's not, you know, I'm not sure it advances our analysis. I would point you to. And given the history of the term segregation, I find it off putting. I would point you to many people do. I would point you to volume two, page 240 over the record where the National Council on Disability. But they weren't prepared. They weren't proposing to take him out of the classroom all the time. All they were proposing to do was increase the amount of. So I'm having trouble with segregation. I've never known a segregation system that said you'll be segregated for 14 percent of your time. But you can use the term. I just told you why. It's the presumption. You want to continue using it. Also, it's the presumption that it's the presumption that you're out because of a disability. The presumption they have is that you leave because you are different. So, you know, I don't need to use that term, but I think I would ask what these experts, the school teachers and the people who are working directly with them. What does their sincere beliefs show us in the record? We don't know what would have happened in the 1920 school year. But in February 2018 and May 2018, both of those IEPs, they sincerely believed he needed a much more restrictive program, and they were wrong. He met their goals that they testified when they wrote them would have indicated an appropriate amount of progress. And so, you know, we know that their beliefs were just wrong. So why accept them moving forward? Further, Basquero, the student's own expert, testified that he could make no progress in a general education setting, presumably because they were trying to maintain a private educational program that had previously been funded. And at some point in the litigation, their request changed. And in RM, there was no evidence in the record that he was making any educational progress. So it's a very, very different case. Just a last point, if I could. With respect to what happens in general education, why it's important. If you read Andrew, everything is about access to general education, access to the general education curriculum. And why is that important? Even for a student who's much more significantly impacted by their disability than the student in this case. It's because general education is what everybody knows. It's the world. It's creating citizens. So I had a case with a student who, you know, he had significant cognitive impairments, but he was in general education all day. And what you get exposed to is all the stuff everybody else gets exposed to. And one of the things that came out in that hearing was that he was in the classroom for long division. He couldn't do one-to-one correspondence effectively. He couldn't add effectively up to ten. But he was in there for long division, and he went home after sitting through a lesson about long division in third grade or fourth grade, and he had school for his little brothers. And he put an equation up on the board. And for the rest of his life, he will know, if people are talking about division or multiplication, that it's that kind of thing. If you're not there, if you're in a totally different classroom where those subjects aren't even covered, and no one gets there, you have no idea whether division is Martians or rain or what it is. And there's a million things like that. There's a million opportunities that are lost for understanding what everyone else is talking about and the norms and understandings that we all share. It's being in society as being in general education. Okay. Thank you very much. Appreciate your helpful arguments on both sides here. The case just argued is submitted, and we are adjourned for the day. All rise. This court for this session stands adjourned.
judges: WATFORD, HURWITZ, Vitaliano